105TH CONGRESS
*2d Session*

SENATE

TREATY DOC.
105–42

# TREATY WITH BRAZIL ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE FEDERATIVE REPUBLIC OF BRAZIL ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS, SIGNED AT BRASILIA ON OCTOBER 14, 1997

APRIL 28, 1998.—Treaty was read the first time and, together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate.

U.S. GOVERNMENT PRINTING OFFICE
59–118 WASHINGTON : 1998

## LETTER OF TRANSMITTAL

THE WHITE HOUSE, *April 28, 1998.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty between the Government of the United States of America and the Government of the Federative Republic of Brazil on Mutual Legal Assistance in Criminal Matters, signed at Brasilia on October 14, 1997. I transmit also, for the information of the Senate, the report of the Department of State with respect to the Treaty.

The Treaty is one of a series of modern mutual legal assistance treaties that the United States is negotiating in order to counter criminal activities more effectively. The Treaty should be an effective tool to assist in the prosecution of a wide variety of modern criminals, including those involved in terrorism, other violent crimes, drug trafficking, money laundering, and other "white-collar" crime. The Treaty is self-executing, and will not require new legislation.

The Treaty provides for a broad range of cooperation in criminal matters. Mutual assistance available under the Treaty includes: (1) Locating or identifying persons or items; (2) serving documents; (3) taking testimony or statements of persons; (4) transferring persons in custody for testimony or other purposes; (5) providing documents, records, and items; (6) executing requests for searches and seizures; (7) assisting in proceedings related to immobilization and forfeiture of assets, restitution, and collection of fines; and (8) any other form of assistance not prohibited by the laws of the Requested State.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

WILLIAM J. CLINTON.

## LETTER OF SUBMITTAL

---

DEPARTMENT OF STATE,
*Washington.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty between the Government of the United States of America and the Government of the Federative Republic of Brazil on Mutual Legal Assistance in Criminal Matters ("the Treaty"), signed at Brasilia on October 14, 1997. I recommend that the Treaty be transmitted to the Senate for its advice and consent to ratification.

The Treaty covers mutual legal assistance in criminal matters. In recent years, similar bilateral treaties have entered into force with a number of countries. This Treaty contains many provisions similar to those in the other treaties.

The Treaty will enhance our ability to investigate and prosecute a variety of offenses, including drug trafficking, terrorism, other violent crimes, and money laundering and other white-collar crime. The Treaty is designed to be self-executing and will not require new legislation.

Article 1 contains a non-exhaustive list of the major types of assistance to be provided under the Treaty, including taking the testimony or statements of persons; providing documents, records, and items; locating or identifying persons or items; serving documents; transferring persons in custody for testimony or other purposes; executing requests for searches and seizures; assisting in proceedings related to immobilization and forfeiture of assets, restitution, and collection of fines; and providing any other form of assistance not prohibited by the laws of the Requested States.

The scope of the Treaty includes not only the investigation, prosecution, and prevention of criminal offenses, but also forfeiture, restitution, and collection of fines, and other proceedings related to criminal matters, which may be civil or administrative in nature. Moreover, assistance under the Treaty is to be provided without regard to dual criminality (*i.e.*, whether the conduct involved would constitute an offense under the laws of both States).

Article 1(4) states that the Parties recognize the particular importance of combating serious criminal activities, including money laundering and the illicit trafficking in firearms, ammunition, and explosives, and that the Parties shall provide each other with assistance with respect to such matters. However, the paragraph was not intended by the negotiators to require the Parties to give priority or special treatment to assistance with respect to the specified offenses; accordingly, the paragraph expressly provides that the

commitment to provide assistance regarding such offenses imposes no limitation on the scope of assistance established under the Article.

Article 1 also states explicitly that the Treaty is intended solely for mutual legal assistance between the Parties. The Treaty provisions shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impeded the execution of a request.

Article 2 provides for the establishment of Central Authorities and defines the Central Authorities for purposes of the Treaty. For the United States, the Central Authority shall be the Attorney General or a person designated by the Attorney General. For Brazil, the Central Authority shall be the Ministry of Justice. The Article provides that the Central Authorities shall make and receive requests pursuant to the Treaty, and that the Central Authorities shall communicate directly with one another for purposes of the Treaty.

Article 3 sets forth the circumstances under which the Central Authority of the Requested State may deny assistance under the Treaty. A request may be denied if it relates to a military offense that would not be an offense under ordinary criminal law; if its execution would prejudice the security or similar essential interests of the Requested State; or if the request is not made in conformity with the Treaty.

Before denying assistance under Article 3, the Central Authority of the Requested State is required to consult with its counterpart in the Requesting State to consider whether assistance can be given subject to such conditions as it deems necessary. If the Requesting State accepts assistance subject to conditions, it is required to comply with them. If the Central Authority of the Requested State denies assistance, it must inform the Central Authority of the Requesting State of the reasons for the denial.

Article 4 prescribes the form and contents of requests under the Treaty, specifying in detail the information required in each request. The Article provides that requests for assistance shall be in writing except that the Central Authority of the Requested State may accept a request in another form in urgent situations. In such cases, unless the Central Authority of the Requested State agrees otherwise, the request must be confirmed in writing within thirty days thereafter. Unless otherwise agreed, all requests and supporting documents shall be in the language of the Requested State.

Article 5 requires that the Central Authority of the Requested State promptly execute requests or, when appropriate, transmit them to the authority having jurisdiction to do so. The Article provides that the competent authorities of the Requested State shall do everything in their power to execute a request. The Courts of the Requested State shall issue subpoenas, search warrants, or other orders necessary to execute the request.

The Central Authority of the Requested State must make all necessary arrangements for and meet the costs of representation of the Requesting State in any proceedings arising out of a request for assistance pursuant to the Treaty. Under Article 5(3), requests are to be executed in accordance with the laws of the Requested State except to the extent that the Treaty provides otherwise. However, the

method of execution specified in the request is to be followed except insofar as it is prohibited by the laws of the Requested State.

If the Central Authority of the Requested State determines that execution of a request would interfere with an ongoing criminal investigation, prosecution, or proceeding in that State, it may postpone execution or, after consultations with the Central Authority of the Requesting State, impose conditions on such execution. If the Requesting State accepts assistance subjects to such conditions, it must comply with them.

Article 5(5) further requires the Requested State, if so requested by the Requesting State, to use its best efforts to keep confidential a request and its contents. If the request cannot be executed without breaching such confidentiality, the Central Authority of the Requested State must so inform the Central Authority of the Requesting State. This provides the Requesting States with the opportunity to decide whether to pursue the request or to withdraw it in order to maintain confidentiality.

Finally, Article 5 requires the Central Authority of the Requested State to respond to reasonable inquiries by the Central Authority of the Requesting State concerning progress toward execution of the request; to promptly inform such Central Authority of the outcome of the execution of the request; and, if the execution of the request is denied, delayed, or postponed, to inform such Central Authority of the reasons therefor.

Article 6 apportions between the two States the costs incurred in executing a request. It provides that the Requested State shall pay all such costs, except for the following items, which shall be paid by the Requesting State: fees of expert witnesses, the costs of translation, interpretation, and transcription, and the allowances and expenses related to the travel of persons pursuant to Articles 10 and 11.

Article 7 provides that the Central Authority of the Requested State may request that the Requesting State not use any information or evidence obtained under the Treaty in any investigation, prosecution, or proceeding other than that described in the request without the prior consent of the Central Authority of the Requested State. The Central Authority of the Requested State may request that information or evidence furnished under the Treaty be kept confidential or be used only subject to terms and conditions it may specify. If the Requesting State accepts the information or evidence subject to such conditions, it shall comply with the conditions. These limitations on use to not preclude a constitutionally required disclosure or use of information in a criminal prosecution. Advance notice by the Requesting State of such disclosure or use is required. Once information or evidence has been made public in the Requesting State in a manner consistent with the other provisions of the Article, no further limitations on use apply, and the information or evidence may thereafter be used for any purpose.

Article 8 provides that a person in the Requested State from whom evidence is required pursuant to the Treaty shall be compelled, if necessary, to appear and testify or produce documents, records, or items. The Article requires the Central Authority of the Requested State, upon request, to inform the Requesting State in

advance about the date and place of the taking of testimony or evidence.

Article 8(3) also requires the Requested State to permit the presence of persons designated in the request during the execution of the request, and to allow such persons to present questions to be posed to the person giving the testimony or evidence. Article 8(4) provides that, in the event that a person whose testimony or evidence is being taken asserts a claim of immunity, incapacity, or privilege under the laws of the Requesting State, the testimony or evidence shall nonetheless be taken and the claim made known to the Central Authority of the Requesting State so that the claim may be resolved by the authorities of that State.

Finally, Article 8(5) provides a mechanism for authentication of documentary evidence produced pursuant to this Article. A form for use regarding business records is included as an appendix to the Treaty (Form A). Records authenticated by means of such form shall be admissible in evidence in the Requesting State.

Article 9 requires that the Requested State provide the Requesting State with copies of publicly available records in the possession of authorities in the Requested State. The Requested State may further provide copies of any records, including documents or information in any form, that are in the possession of authorities in that State, but that are not publicly available, to the same extent and under the same conditions as such copies would be available to its own law enforcement or judicial authorities. However, the Requested State has the discretion to deny such requests entirely or in part. Such official records may be authenticated by the official in charge of maintaining them through the use of Form B appended to the Treaty. Documents authenticated through the use of such form shall be admissible in evidence in the Requesting State.

Article 10 provides a mechanism for the Requesting State to invite the voluntary appearance in its territory of a person located in the Requested State. The Requesting State is required to indicate the extent to which the expenses of the person will be paid. The Central Authority of the Requested State is required to invite the person to appear and promptly to inform the Requesting State of the person's response.

Article 10 further provides that the Central Authority of the Requesting State has discretion to determine that a person appearing in that State pursuant to this Article shall not be subject to service of process, detained, or subjected to any restriction of personal liberty by reason of acts or convictions that preceded the person's departure from the Requested State. The Central Authority of the Requesting State is required to notify the Requested State's Central Authority whether such safe conduct shall be extended. Any safe conduct provided for by this Article shall cease seven days after notification by the Central Authority of the Requesting State to its counterpart in the Requested State that the person's presence is no longer required. The safe conduct shall also cease if the person leaves the Requesting State but voluntarily returns to it. An extension of up to fifteen days may be granted by the Requesting State's Central Authority in its discretion.

Article 11 provides for the temporary transfer of a person in custody in the Requested State to the Requesting State for purposes

of assistance under the Treaty, provided that the person in question and the Central Authorities of both States agree. For example, a witness incarcerated in the Requested State may be transferred to the Requesting State to have his deposition taken in the presence of the defendant. The Article also provides for the transfer of a person in the custody of the Requesting State to the Requested State for purposes of assistance under the Treaty, subject to the consent of the person and the Central Authorities of both States. For example, a defendant in the Requesting State may be transferred for purposes of attending a witness deposition in the Requested State.

Article 11(3) further establishes the express authority and the obligation of the receiving State to maintain the person transferred in custody unless otherwise authorized by the sending State. It further obligates the receiving State to return the person to the custody of the sending State as soon as circumstances permit or as otherwise agreed by both States, and the sending State need not initiate extradition proceedings for return of the person transferred. The person transferred shall receive credit toward service of the sentence imposed in the sending State for time served in the custody of the receiving State.

Article 12 requires the Requested State to use its best efforts to ascertain the location or identity of persons or items specified in a request.

Article 13 obligates the Requested State to use its best efforts to effect service of any documents relating, in whole or in part, to any request for assistance under the Treaty. A request for the service of a document requiring a person to appear before an authority in the Requesting State must be transmitted within a reasonable time prior to the scheduled appearance. The Requested State is required to return proof of service in the manner specified in the request.

Article 14 obligates the Requested State to execute requests for search, seizure, and delivery of any item to the Requesting State if the request includes the information justifying such action under the laws of the Requested State. The Article provides that, upon request, every official of the Requested State who has had custody of a seized item shall certify, through the use of Form C appended to the Treaty, the description of the item, the continuity of its custody, and the integrity of its condition. No further certification is required, and the certificate shall be admissible evidence in the Requesting State. Article 14 further provides that the Central Authority of the Requested State may impose upon the Requesting State terms and conditions deemed necessary to protect third party interests in items to be transferred.

Article 15 requires the Central Authority of the Requested State, upon request of its counterpart in the Requesting State, to return as soon as possible any documents, records, or items furnished to it in execution of a request under the Treaty.

Article 16 provides that, if the Central Authority of one Party becomes aware of proceeds or instrumentalities of offenses that are located in the territory of the other Party and may be forfeitable or otherwise subject to seizure under the laws of that Party, it may so inform the Central Authority of that Party. If that Party has jurisdiction, it may present this information to its authorities for a

determination whether any action is appropriate under its laws, and such authorities shall, through their Central Authority, notify the other Party of any action taken.

Article 16 also obligates the Parties to assist each other, to the extent permitted by their respective laws, in proceedings relating to forfeiture of proceeds and instrumentalities of offenses, restitution to victims of crime, and the collection of fines imposed as sentences in criminal proceedings. Such assistance may include action to temporarily immobilize the proceeds or instrumentalities of crime pending further proceedings. A Party having custody over proceeds or instrumentalities of offenses is required to dispose of them in accordance with its laws. Either Party may transfer all or part of such assets, or the proceeds of their sale, to the other Party, to the extent permitted by the transferring Party's laws and upon such terms as it deems appropriate.

Article 17 states that assistance and procedures set forth in the Treaty shall not prevent either Party from granting assistance to the other Party under other applicable international agreements, or through the provisions of its national laws. The Parties may also provide assistance to each other through the provisions of any bilateral arrangement, agreement, or practice that may be applicable.

Article 18 provides that the Central Authorities of the parties shall consult, at times mutually agreed upon, to promote the most effective use of the Treaty, and may agree on such practical measures as may be necessary to facilitate implementation of the Treaty.

Article 19 states that the Treaty shall apply to requests presented after the date of its entry into force, even if the acts or omissions constituting the offense occurred before that date.

Article 20 provides that the Treaty is subject to ratification and shall enter into force upon the exchange of the instruments of ratification. The Article also provides that the Parties may amend the Treaty by mutual agreement, and any such amendment would enter into force upon a written exchange of notifications between the Parties, through the diplomatic channel, that all domestic requirements for its entry into force have been completed. Article 20 further provides that either Party may terminate the Treaty by written notice to the other Party. Such termination would take effect six months following the date of notification.

A Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in recommending approval of this Treaty by the Senate as soon as possible.

Respectfully submitted.

MADELEINE ALBRIGHT.

# TREATY BETWEEN
# THE GOVERNMENT OF THE UNITED STATES OF AMERICA
# AND
# THE GOVERNMENT OF THE FEDERATIVE REPUBLIC OF BRAZIL
# ON
# MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

TABLE OF CONTENTS


| | |
|---|---|
| Article 1 | Scope of Assistance |
| Article 2 | Central Authorities |
| Article 3 | Limitations on Assistance |
| Article 4 | Form and Contents of Requests |
| Article 5 | Execution of Requests |
| Article 6 | Costs |
| Article 7 | Limitations on Use |
| Article 8 | Testimony or Evidence in the Requested State |
| Article 9 | Official Records |
| Article 10 | Testimony in the Requesting State |
| Article 11 | Transfer of Persons in Custody |
| Article 12 | Location or Identification of Persons or Items |
| Article 13 | Service of Documents |
| Article 14 | Search and Seizure |
| Article 15 | Return of Items |
| Article 16 | Assistance in Forfeiture Proceedings |
| Article 17 | Compatibility with Other Treaties |
| Article 18 | Consultation |
| Article 19 | Application |
| Article 20 | Ratification, Entry Into Force, and Termination |

Form A Certificate of Authenticity of Business Records

Form B Attestation of Authenticity of Foreign Public Documents

Form C Attestation With Respect to Seized Articles

The Government of the United States of America and the Government of the Federative Republic of Brazil,

Desiring to improve the effectiveness of the law enforcement authorities of both countries in the investigation, prosecution, and prevention of crime through cooperation and mutual legal assistance in criminal matters,

Have agreed as follows:

## Article 1
### Scope of Assistance

1. The Parties shall provide mutual assistance, in accordance with the provisions of this Treaty, in connection with the investigation, prosecution, and prevention of offenses, and in proceedings related to criminal matters.

2. Assistance shall include:

(a) taking the testimony or statements of persons;

(b) providing documents, records, and items;

(c) locating or identifying persons or items;

(d) serving documents;

(e) transferring persons in custody for testimony or other purposes;

(f) executing requests for searches and seizures;

(g) assisting in proceedings related to immobilization and forfeiture of assets; restitution; collection of fines; and

(h) any other form of assistance not prohibited by the laws of the Requested State.

3. Assistance shall be provided without regard to whether the conduct that is the subject of the investigation, prosecution, or proceeding would be punishable under the legislation in both States.

4. The Parties recognize the particular importance of combating serious criminal activities, including money laundering and the illicit trafficking in firearms, ammunition and explosives. Without limitation to the scope of assistance established in this Article, the Parties shall provide each other assistance on such matters in accordance with this Treaty.

5. This Treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

Article 2

Central Authorities

1. Each Party shall designate a Central Authority to make and receive requests pursuant to this Treaty.

2. For the United States of America, the Central Authority shall be the Attorney General or a person designated by the Attorney General. For the Federative Republic of Brazil, the Central Authority shall be the Ministry of Justice.

3. The Central Authorities shall communicate directly with one another for the purposes of this Treaty.

Article 3

Limitations on Assistance

1. The Central Authority of the Requested State may deny assistance if:

(a) the request relates to an offense under military law which would not be an offense under ordinary criminal law;

(b) the execution of the request would prejudice the security or similar essential interests of the Requested State; or

(c) the request is not made in conformity with the Treaty.

2. Before denying assistance pursuant to this Article, the Central Authority of the Requested State shall consult with the

Central Authority of the Requesting State to consider whether assistance can be given subject to such conditions as it deems necessary. If the Requesting State accepts assistance subject to these conditions, it shall comply with the conditions.

3. If the Central Authority of the Requested State denies assistance, it shall inform the Central Authority of the Requesting State of the reasons for the denial.

**Article 4**
**Form and Contents of Requests**

1. A request for assistance shall be in writing except that the Central Authority of the Requested State may accept a request in another form in urgent situations. In any such case, if the request is not in writing, it shall be confirmed in writing within thirty days thereafter unless the Central Authority of the Requested State agrees otherwise. The request shall be in the language of the Requested State unless otherwise agreed.

2. The request shall include the following:

(a) the name of the authority conducting the investigation, prosecution, or proceeding to which the request relates;

(b) a description of the subject matter and nature of the investigation, prosecution, or proceeding, including, to the extent known, the specific criminal offenses that relate to the matter;

(c) a description of the evidence, information, or other assistance sought; and

(d) a statement of the purpose for which the evidence, information, or other assistance is sought.

3. To the extent necessary and possible, a request shall also include:

(a) information on the identity and location of any person from whom evidence is sought;

(b) information on the identity and location of a person to be served, that person's relationship to the proceedings, and the manner in which service is to be made;

(c) information on the identity and whereabouts of a person to be located;

(d) a precise description of the place or person to be searched and of the items to be seized;

(e) a description of the manner in which any testimony or statement is to be taken and recorded;

(f) a list of questions to be asked of a witness;

(g) a description of any particular procedure to be followed in executing the request;

(h) information as to the allowances and expenses to which a person asked to appear in the Requesting State will be entitled; and

(i) any other information that may be brought to the attention of the Requested State to facilitate the execution of the request.

**Article 5**

**Execution of Requests**

1. The Central Authority of the Requested State shall promptly execute the request or, when appropriate, shall transmit it to the officials having authority to do so. The competent officials of the Requested State shall do everything in their power to execute the request. The Courts of the Requested State shall issue subpoenas, search warrants, or other orders necessary to execute the request.

2. The Central Authority of the Requested State shall make all necessary arrangements for and meet the costs of the representation in the Requested State of the Requesting State in any proceedings arising out of a request for assistance pursuant to this Treaty.

3. Requests shall be executed in accordance with the laws of the Requested State except to the extent that this Treaty provides otherwise. However, the method of execution specified in the request shall be followed except insofar as it is prohibited by the laws of the Requested State.

4. If the Central Authority of the Requested State determines that execution of a request would interfere with an ongoing criminal investigation, prosecution, or proceeding in that State, it may postpone execution, or make execution subject to conditions determined to be necessary after consultations with the Central Authority of the Requesting State. If the Requesting State accepts the assistance subject to the conditions, it shall comply with the conditions.

5. The Requested State shall use its best efforts to keep confidential a request and its contents if such confidentiality is requested by the Central Authority of the Requesting State. If the request cannot be executed without breaching such confidentiality, the Central Authority of the Requested State shall so inform the Central Authority of the Requesting State, which shall then determine whether the request should nevertheless be executed.

6. The Central Authority of the Requested State shall respond to reasonable inquiries by the Central Authority of the Requesting State concerning progress toward execution of the request.

7. The Central Authority of the Requested State shall promptly inform the Central Authority of the Requesting State of the outcome of the execution of the request. If the execution of the request is denied, delayed, or postponed, the Central Authority of the Requested State shall inform the Central Authority of the Requesting State of the reasons for the denial, delay, or postponement.

**Article 6**
**Costs**

The Requested State shall pay all costs relating to the execution of the request, except for the fees of expert witnesses, the costs of translation, interpretation, and transcription, and the allowances and expenses related to travel of persons pursuant to Articles 10 and 11, which fees, costs, allowances, and expenses shall be paid by the Requesting State.

**Aricle 7**
**Limitations on Use**

1. The Central Authority of the Requested State may request that the Requesting State not use any information or evidence obtained under this Treaty in any investigation, prosecution, or proceeding other than that described in the request without the prior consent of the Central Authority of the Requested State. In such cases, the Requesting State shall comply with the conditions.

2. The Central Authority of the Requested State may request that information or evidence furnished under this Treaty be kept confidential or be used only subject to terms and conditions it may specify. If the Requesting State accepts the information or evidence subject to such conditions, the Requesting State shall comply with the conditions.

3. Nothing in this Article shall preclude the use or disclosure of information to the extent that there is an obligation to do so under the Constitution of the Requesting State in a criminal prosecution. The Requesting State shall notify the Requested State in advance of any such proposed disclosure.

4. Information or evidence that has been made public in the Requesting State in a manner consistent with paragraph 1 or 2 may thereafter be used for any purpose.

Article 8

Testimony or Evidence in the Requested State

1. A person in the Requested State from whom testimony or evidence is requested pursuant to this Treaty shall be compelled, if necessary, to appear and testify or produce documents, records, or items.

2. Upon request, the Central Authority of the Requested State shall furnish information in advance about the date and place of the taking of the testimony or evidence pursuant to this Article.

3. The Requested State shall permit the presence of such persons as specified in the request during the execution of the request, and shall allow such persons to present questions to be asked of the person giving the testimony or evidence.

4. If the person referred to in paragraph 1 asserts a claim of immunity, incapacity, or privilege under the laws of the Requesting State, the testimony or evidence shall nonetheless be taken and the claim made known to the Central Authority of the Requesting State so that the claim may be resolved by the authorities of that State.

5. Evidence produced in the Requested State pursuant to this Article or which is the subject of testimony taken under this Article may be authenticated by an attestation, including, in the case of business records, authentication in the manner indicated in Form A appended to this Treaty. Documents authenticated by Form A shall be admissible evidence in the Requesting State.

**Article 9**
**Official Records**

1. The Requested State shall provide the Requesting State with copies of publicly available records, including documents or information in any form, in the possession of authorities in the Requested State.

2. The Requested State may provide copies of any records, including documents or information in any form, that are in the possession of authorities in that State, but that are not publicly available, to the same extent and under the same conditions as such copies would be available to its own law enforcement or judicial authorities. The Requested State may in its discretion deny a request pursuant to this paragraph entirely or in part.

3. Official records produced pursuant to this Article may be authenticated by the official in charge of maintaining them through the use of Form B appended to this Treaty. No further authentication shall be necessary. Documents authenticated under this paragraph shall be admissible evidence in the Requesting State.

**Article 10**
**Testimony in the Requesting State**

1. When the Requesting State requests the appearance of a person in that State, the Requested State shall invite the person

to appear before the appropriate authority in the Requesting State. The Requesting State shall indicate the extent to which the expenses will be paid. The Central Authority of the Requested State shall promptly inform the Central Authority of the Requesting State of the response of the person.

2. The Central Authority of the Requesting State may, in its discretion, determine that a person appearing in the Requesting State pursuant to this Article shall not be subject to service of process, or be detained or subjected to any restriction of personal liberty, by reason of any acts or convictions that preceded his departure from the Requested State. The Central Authority of the Requesting State shall promptly inform the Central Authority of the Requested State whether such safe conduct shall be extended.

3. The safe conduct provided for by this Article shall cease seven days after the Central Authority of the Requesting State has notified the Central Authority of the Requested State that the person's presence is no longer required, or when the person, having left the Requesting State, voluntarily returns. The Central Authority of the Requesting State may, in its discretion, extend this period for up to fifteen days.

Article 11
Transfer of Persons in Custody

1. A person in the custody of the Requested State whose presence in the Requesting State is sought for purposes of assistance under this Treaty shall be transferred from the Requested State to the Requesting State for that purpose if the person consents and if the Central Authorities of both States agree.

2. A person in the custody of the Requesting State whose presence in the Requested State is sought for purposes of assistance under this Treaty may be transferred from the Requesting

State to the Requested State if the person consents and if the Central Authorities of both States agree.

3. For purposes of this Article:

(a) the receiving State shall have the authority and the obligation to keep the person transferred in custody unless otherwise authorized by the sending State;

(b) the receiving State shall return the person transferred to the custody of the sending State as soon as circumstances permit or as otherwise agreed by both Central Authorities;

(c) the receiving State shall not require the sending State to initiate extradition proceedings for the return of the person transferred; and

(d) the person transferred shall receive credit for service of the sentence imposed in the sending State for time served in the custody of the receiving State.

Article 12
Location or Identification of Persons or Items

The Requested State shall use its best efforts to ascertain the location or identity of persons or items specified in the request.

Article 13
Service of Documents

1. The Requested State shall use its best efforts to effect service of any document relating, in whole or in part, to any

request for assistance made by the Requesting State under the provisions of this Treaty.

2. The Requesting State shall transmit any request for the service of a document requiring the appearance of a person before an authority in the Requesting State within a reasonable time prior to the scheduled appearance.

3. The Requested State shall return a proof of service in the manner specified in the request.

**Article 14**
**Search and Seizure**

1. The Requested State shall execute a request for the search, seizure, and delivery of any item to the Requesting State if the request includes the information justifying such action under the laws of the Requested State.

2. Upon request, every official who has custody of a seized item shall certify, through the use of Form C appended to this Treaty, the continuity of custody, the description of the item, and the integrity of its condition. No further certification shall be required. Form C shall be admissible evidence in the Requesting State.

3. The Central Authority of the Requested State may require that the Requesting State agree to the terms and conditions deemed to be necessary to protect third party interests in the item to be transferred.

**Article 15**

**Return of Items**

The Central Authority of the Requested State may require that the Central Authority of the Requesting State return, as soon as possible, any documents, records, or items furnished to it in execution of a request under this Treaty.

**Article 16**

**Assistance in Forfeiture Proceedings**

1. If the Central Authority of one Party becomes aware of proceeds or instrumentalities of offenses that are located in the territory of the other Party and may be forfeitable or otherwise subject to seizure under the laws of that Party, it may so inform the Central Authority of the other Party. If that other Party has jurisdiction in this regard, it may present this information to its authorities for a determination whether any action is appropriate. These authorities shall issue their decision in accordance with the laws of their country, and shall, through their Central Authority, report to the other Party on the action taken.

2. The Parties shall assist each other to the extent permitted by their respective laws in proceedings relating to the forfeiture of the proceeds and instrumentalities of offenses, restitution to the victims of crime, and the collection of fines imposed as sentences in criminal prosecutions. Such assistance may include action to temporarily immobilize the proceeds or instrumentalities pending further proceedings.

3. The Party that has custody over proceeds or instrumentalities of offenses shall dispose of them in accordance with its laws. Either Party may transfer all or part of such assets, or the proceeds of their sale, to the other Party, to the

extent permitted by the transferring Party's laws and upon such terms as it deems appropriate.

Article 17
Compatibility with Other Treaties

Assistance and procedures set forth in this Treaty shall not prevent either Party from granting assistance to the other Party through the provisions of other applicable international agreements, or through the provisions of its national laws. The Parties may also provide assistance to each other pursuant to any bilateral arrangement, agreement, or practice that may be applicable.

Article 18
Consultation

The Central Authorities of the Parties shall consult, at times mutually agreed to by them, to promote the most effective use of this Treaty. The Central Authorities may also agree on such practical measures as may be necessary to facilitate the implementation of this Treaty.

Article 19
Application

This Treaty shall apply to any request presented after the date of its entry into force, even if the acts or omissions constituting the offense occurred before that date.

Article 20
Ratification, Entry Into Force, and Termination

1. This Treaty shall be subject to ratification, and the instruments of ratification shall be exchanged as soon as possible.

2. This Treaty shall enter into force upon the exchange of the instruments of ratification.

3. The Parties may amend this Treaty by mutual agreement, and any such amendment shall enter into force upon a written exchange of notifications between the Parties, through the diplomatic channel, that all domestic requirements for its entry into force have been completed.

4. Either Party may terminate this Treaty by means of written notice, through the diplomatic channel, to the other Party. Termination shall take effect six months following the date of notification.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE at Brasilia, in duplicate, this 14th day of October, 1997, in the English and Portuguese languages, both texts being equally authentic.

| | |
|---|---|
| Madeleine Albright | [signature] |
| FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA: | FOR THE GOVERNMENT OF THE FEDERATIVE REPUBLIC OF BRAZIL: |

FORM A (For Use With Article 8)

CERTIFICATE OF AUTHENTICITY OF
BUSINESS RECORDS

I, ______________________________, attest on penalty of
(Name)

criminal punishment for false statement or false attestation that I am employed by

______________________________________________________
(Name of Business from which documents are sought)

and that my official title is ______________________________

I further state that each of the records attached hereto is the original or a duplicate of the original records in the custody of ______________________________________________
(Name of Business from which documents are sought)

I further state that:

A) such records were made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;

B) such records were kept in the course of a regularly conducted business activity;

C) the business activity made such records as a regular practice; and

D) if such record is not the original, such record is a duplicate of the original.

__________________________ Signature

__________________________ Date

Sworn to or affirmed before me, ______________________________,
(Name)

a ______________________________________________ this
(notary public, judge, judicial officer, etc.)

____________ day of ________________________ 19_____.

FORM B (For Use With Article 9)

ATTESTATION OF AUTHENTICITY OF FOREIGN PUBLIC DOCUMENTS

I, ______________________ (Name), attest on penalty of criminal punishment for false statement or attestation that my position with the Government of ______________________ (Country) is ______________________ (Official Title), and that in that position I am authorized by the law of ______________________ (Country) to attest that the documents attached and described below are true and accurate copies of original official records which are recorded or filed in ______________________ (Name of Office or Agency), which is a government office or agency of ______________________ (Country).

Description of Documents:

______________________ (Signature)

______________________ (Title)

______________________ (Date)

FORM C (For Use With Article 14)

ATTESTATION WITH RESPECT TO SEIZED ARTICLES

I, ______________________ (Name), attest on penalty of criminal punishment for false statements or attestation that my position with the Government of ______________________ (Country) is ______________________ (Official Title). I received the articles listed below from ______________________ (Name of Person) on ______________________ (Date), at ______________________ (Place) in the following condition:

Description of Article:

Changes in Condition while in my custody:

Official Seal

______________________
(Signature)

______________________
(Title)

______________________
(Date)